OPINION
Defendant-appellant Debbie Brown appeals her convictions and sentence entered by the New Philadelphia Municipal Court on ten counts of cruelty to animals, in violation of R.C. 959.13(A)(1). Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE CASE AND FACTS
On July 24, 1998, Lesli J. Humphries of the Tuscarawas County Humane Society filed a complaint against appellant, charging appellant with ten counts of cruelty to animals. Appellant entered a written plea of not guilty to the charges on August 7, 1998. Appellant filed a Waiver of Time and Request for Bill of Particulars. The State complied with appellant's Request for Bill of Particulars on October 15, 1998. Subsequently, appellant filed a motion for a more specific bill of particulars. On November 25, 1998, appellant filed a Motion to Suppress, moving the trial court to suppress all of the evidence obtained during a search of her property on June 5, 1998. Appellant maintained the affidavit in support of the search warrant not only contained false information, but also included information which was obtained in violation of appellant's Constitutional Rights. The trial court conducted a hearing on appellant's motion to suppress on January 4, 1999. Prior to the trial court's ruling on appellant's motion to suppress, the State filed an Amended Bill of Particulars on January 21, 1999. Via Journal Entry and Decision filed February 22, 1999, the trial court overruled appellant's motion. The matter proceeded to jury trial on April 30, 1999. At trial, Lesli Humphries, testified she received a complaint from an individual named Patty Pound on June 1, 1998, alleging abuse of rabbits housed on appellant's property at 3386 Henderson School Road, New Philadelphia, Ohio. According to the complainant, the rabbits were living in unsanitary conditions and were being deprived of food and water. Humphries and her assistant, Tammy Durning, visited appellant's residence on June 3, 1998. Upon their arrival at the residence, Humphries and Durning proceeded to the house and knocked on the front door. When no one answered the door, the two humane society officers walked down the driveway toward the pole barn, which housed the rabbits. Humphries testified they did not enter the pole barn, however, they did look into the structure through a small door which was open. The large doors on the backside of the pole barn were also open. Humphries noticed an overwhelming odor of ammonia, feces, and urine emanating from the barn. Upon looking into the barn, Humphries observed rabbit cages stacked three high with no drop pans, resulting in the rabbits in the top cages defecating and urinating on the rabbits in the lower cages. Humphries also noticed knocked over cages, which sat partially on the ground and partially stacked on other cages. Piles of feces covered the floor. Neither Humphries nor Durning entered the barn. As the two women started toward their vehicle, they encountered appellant's husband, Marvin Brown. Humphries advised Mr. Brown the Humane Society had received a complaint regarding the rabbits and asked him if she and Durning could enter the barn and take photographs. Mr. Brown consented to Humphries' request. Inside, Humphries observed rows of rabbit cages, which ran the entire length of the barn. She noticed at least a dozen dogs housed in what appeared to be two pig stalls. The entire barn floor was covered with feces. Humphries observed dead rabbits in the barn. She testified she saw the body of one rabbit on the ground in one of the aisles. She also saw a wooden crate which contained numerous dead rabbits. Humphries looked into each cage. She did not observe any food in the food bowls or in the self-feeders which were on some of the cages. The only thing she did observe in the food bowls and feeders was rabbit feces. Humphries also noticed a lack of water and watering devices in the cages. Although she saw a garden hose on the floor of the barn, she stated the hose was buried under feces. She noted this hose was the only device for providing water to the animals. Humphries recalled stepping up to her knees in a pile of feces. Upon completing the investigation, Humphries issued a written warning to Mr. Brown. Humphries called an emergency meeting of the Humane Society that evening, believing the situation was a matter of life or death for the rabbits. At the meeting, the Humane Society coordinated the efforts to be undertaken in removing the rabbits from appellant's property, and determined a search warrant would be needed. On June 4, 1998, Humphries returned to appellant's property with Sgt. McEnroe of the Tuscarawas County Sheriff's Department and Tammy Durning in order to show Sgt. McEnroe the buildings for which they desired the search warrant. Humphries, Sgt. McEnroe, and Durning found no one at the property. The group walked around the pole barn, however, they did not enter the structure. On June 5, 1998, Humphries obtained a search warrant which was executed that day. Humphries; Sgt. McEnroe; Karen Slough, the dog warden; Jerry Warren, the assistant dog warden; Tammy Durning; and Beth Budavich, who engages in wildlife rehabilitation, arrived on the property to execute the search warrant. Mr. Brown was present on the property, and Humphries showed him the search warrant. Mr. Brown cooperated with the group, assisting the dog warden in carrying the dogs to the warden's truck. The Humane Society had made arrangements for the animals to be transported to and housed at the Tuscarawas County Fairgrounds. Once at the fairgrounds, a veterinarian examined the rabbits. Humphries noticed some changes had been made to the barn between her initial visit on June 3, 1998, and June 5, 1998. She testified the dead rabbits were no longer in the barn. Additionally, a row of cages which had been hanging from the ceiling had been relocated to the floor. Humphries recalled she personally removed thirty or forty rabbits from the barn. She noticed the rabbits felt thin, and also observed some of the rabbits had matting around their rear-ends. All of the rabbits smelled of urine. Many of the rabbits were sneezing and had discharge coming from their noses and eyes. Humphries did not see any food in the cages on that day, however, she did see water in some of the cages. Humphries recalled the doors of some of the cages could not be opened because the feces were piled so high. Humphries testified approximately 138 or 139 rabbits were removed from appellant's property. Humphries explained a determination of the sex of the rabbits was not conducted prior to removing the animals because of the number of rabbits and the Humane Society's desire to remove the animals as quickly as possible. On cross-examination, Humphries conceded male rabbits had been placed in cages with other male rabbits, which resulted in some of the animals being injured during the transporting to the fairgrounds. Humphries also acknowledged rabbits of different breeds were placed in cages together. Humphries noted, although she felt the conditions on June 3, 1998, were life threatening, her only option was to issue a warning to Mr. Brown because she had no way to do anything that day. Tammy Durning, the assistant humane society officer, testified she and Humphries proceeded to appellant's property on June 3, 1998, to investigate a complaint of abuse. Durning verified she and Humphries did not enter the barn until Mr. Brown appeared and granted them permission to do so. Durning testified similarly to Humphries with respect to the observations once inside the barn. Like Humphries, Durning saw a crate of dead rabbits as well as the body of one rabbit on the floor of an aisle. She noted the living rabbits were dirty, appeared thin, and had mucus discharging from their eyes and noses. Durning did not see any food or water in the cages. Although Durning recalled the cages were appropriate sizes for the rabbits, she stated the cages were filled with feces and very dirty. In addition to the rabbits, the barn housed a number of dogs, penned in what appeared to be a pig sty, and chickens in a washtub. Durning stated she, Humphries, and Sgt. McEnroe returned to appellant's property on June 4, 1998. After their knocks were met with no response, the group walked toward the pole barn. She testified no one entered the barn. Durning assisted Humphries in obtaining the search warrant on June 5, 1998, as well as the execution of the search warrant. At the property, she carried empty cages inside the barn and placed rabbits into the cages. She personally removed forty rabbits from appellant's property. Durning recalled the rabbits felt thin and were sticky with urine. Durning noticed the rabbits' conditions did not appear any different on June 5, 1998, from their conditions on June 3, 1998. Beth Budavich, a licensed rehabilitator of wildlife, testified she was present on appellant's property on June 5, 1998, during the execution of the search warrant. After unloading cages from her van, Budavich proceeded to the barn to assess the situation. The smell inside the barn was so strong, Budavich had to leave the building. The dog warden gave her something to apply to her nose to help alleviate the odor. Back in the barn, Budavich began to remove rabbits from the cages. She recalled she removed at least fifty rabbits that day. Budavich testified the doors of some of the cages could not be opened due to the amount of feces piled inside the cages. When asked to describe how the rabbits felt, Budavich remembered one pen in particular which housed three rabbits. One of the rabbits was covered in sores and had little fur remaining on its body, while another rabbit was so thin, she could feel all the bones in its rib cage. Budavich described the barn as "[h]orrendous." She continued, "[t]here was broken glass and just junk. Cages were imbedded in feces. Some of them you couldn't see the rabbit in the cage it was so bad." T., Vol. I at 172. She recalled seeing little, if any, food and no water for the animals. Karen Slough, the Tuscarawas County Dog Warden, was also present during the execution of the search warrant. When asked to describe the odor she detected upon entering the barn, Slough answered, "Nasty, stinky, bad." T., Vol. I at 186. In order to get to the dogs housed inside the barn, Slough had to pass through the rabbit area. She observed "so much filth out there, I had never seen anything like it before." She continued, "[t]here were rows and rows of cages of rabbits and the feces in the cages was maybe a foot high." Id. at 187. Slough recalled she was also on appellant's property on June 4, 1998, at Humphries' request. On that day, Slough observed the situation and had general discussions with Humphries about whether or not to pursue the matter further. Slough testified no one entered appellant's home or the barn on that day. She could not recall whether anyone took photographs. Sgt. McEnroe testified he became involved with the investigation on June 4, 1998. On that day, Lesli Humphries presented herself at the Tuscarawas County Sheriff's Department, seeking assistance in obtaining a search warrant for appellant's property. Sgt. McEnroe proceeded to appellant's property in order to speak with Mr. Brown. Humphries, Durning, and Slough arrived at the property shortly thereafter. The group remained on appellant's property for fifteen or twenty minutes. Sgt. McEnroe testified he did not see Humphries enter any of the structures on the property, although he acknowledged Humphries remained on the property after he departed. Thereafter, Sgt. McEnroe assisted Humphries in speaking with Judge Lile of the Tuscarawas County Court of Common Pleas in order to obtain a search warrant. Sgt. McEnroe was present on the property during the execution of the search warrant and prepared an inventory of the animals which were removed from the property. On cross-examination Sgt. McEnroe indicated Humphries never informed him she had given Mr. Brown a written warning on June 3, 1998. The sergeant did not know a warning had been issued until June 5, 1998, when appellant and Mr. Brown showed the sergeant the progress they had made in accordance with the warning. Sgt. McEnroe noted, if he gives a written warning, which states a specific period of time in which to comply, he would have waited for the time period to run before obtaining as search warrant. The sergeant admitted he could not say whether the issuance of a written warning would have changed Judge Lile's opinion. Dr. Theresa Heidel, a veterinarian, testified she examined appellant's rabbits on June 5, 1998, at the Tuscarawas County Fairgrounds, examining 138 rabbits in total. Describing her examination of the each rabbit, she stated she removed the rabbit from its cage and made a visual observation of its mouth, nose, ears, and hands to determine how much flesh was present on the particular rabbit. She also listened to the rabbit's lungs with a stethoscope and conducted gentle palpitations to determine if the rabbit was pregnant. Dr. Heidel proceeded to discuss her findings regarding rabbits A-J, the ten rabbits at issue herein. With respect to rabbit A, Dr. Heidel testified the rabbit's fur was matted and filthy. The rabbit showed signs compatible with mange. Additionally, rabbit A was extremely emaciated and had mucus discharging from its nose. Dr. Heidel explained when she used the word "emaciated", she was describing a rabbit whose vertebra of the back bone could be felt and between whose ribs you could stick your fingers. Dr. Heidel stated a rabbit's fur could become matted due to diarrhea or something of that nature, but generally such condition was due to neglect. Dr. Heidel opined rabbit A had become emaciated from a lack of proper feeding. The nasal discharge was the result of an upper respiratory infection. With respect to rabbit B, Dr. Heidel noted the rabbit's fur was severally matted around the rectum. This rabbit also suffered from severe nasal discharge, mange, and conjunctivitis. Dr. Heidel opined the condition of this rabbit was caused by neglect. Dr. Heidel recalled rabbit C was extremely emaciated and suffered a condition known as "wryneck," which is a disease caused by a bacteria. Dr. Heidel explained wryneck can cause an upper respiratory infection and, if not treated, move into the middle ear and cause a severe middle ear infection from which the rabbit would lose its equilibrium. Dr. Heidel stated the ear infection would be very painful for the rabbit. Because no reasonable remedy exists for wryneck, the only option is to euthanize the animal, which was done with rabbit C. Rabbit D was also very emaciated and suffering from wryneck. Rabbit D was also ultimately euthanized. With respect to rabbit E, Dr. Heidel recalled the rabbit's fur was so severely matted around the rectum the animal was unable to defecate, which resulted in the rabbit suffering from constipation. This rabbit also had severe nasal discharge, was emaciated, and was suffering from wryneck. Dr. Heidel testified rabbit F was actually a doe with seven babies. The babies as well as the mother were "excruciatingly thin" and all emaciated. They were all suffering from conjunctivitis. Dr. Heidel conceded a mother rabbit with so many babies nursing on her was likely to be thin, however, she opined because the babies were also so thin, both the mother and babies needed supplemental food. Dr. Heidel concluded a lack of nutritional supplementation of food to the babies and the mother was the cause of the emaciated conditions of these animals. In order to sustain the babies, the mother needed to be eating at all times and as much as possible. Dr. Heidel testified rabbit G was very emaciated and suffered from severe dehydration. The rabbit was also extremely anemic. Dr. Heidel explained the animal's gums, which are normally pink, were white. Dr. Heidel opined rabbit G showed signs of neglect caused by a lack of food and water. With respect to rabbit H, Dr. Heidel testified the animal was suffering from wryneck, was emaciated, and had conjunctivitis. Dr. Heidel stated these conditions were caused by neglect. Rabbit I likewise suffered from wryneck and was very emaciated. Additionally, this animal had a large amount of mucus discharging from its nose and eyes. Dr. Heidel opined the animal's condition was the result of neglect. Finally, rabbit J had conjunctivitis, severe nasal discharge, and lung sounds consistent with pneumonia. Dr. Heidel testified the signs of neglect to this animal included its overall thinness, and the respiratory infection with a possibility of pneumonia. Regarding the overall condition of the rabbits, Dr. Heidel testified these conditions could not occur overnight, but rather were caused over a period of time, be it weeks or months. On cross-examination, Dr. Heidel stated most of her dealings with rabbits in her practice had been primarily in the pet industry. The veterinarian acknowledged an owner's handling and treatment of rabbits which were pets would be different from an owner's handling and treatment of rabbits bred for meat. Dr. Heidel explained certain treatments and procedures were not necessarily available to production animals because cost becomes an issue. Simply put, the value of the animal does not justify the treatment. Dr. Heidel stated she had no concerns about the fact the rabbits were not separated by sex or breed when transported to the fairgrounds. The veterinarian also explained the number one cause of wryneck was an untreated respiratory infection. She indicated a stressful or traumatic situation would not cause wryneck. The treatment of a rabbit with wryneck would be a permanent course of antibiotics, however, Dr. Heidel acknowledged such treatment could cause problems in meat rabbits. Dr. Heidel testified wryneck is a common disease and very easy to detect. She noted most production people would remove the animal from the rest of the herd to avoid exposing healthy animals to the bacteria which causes wryneck. The veterinarian conceded she would have considered appellant more responsible if she had segregated the wryneck rabbits. However, Dr. Heidel maintained appellant's allowing the animals to progress to the state they were in and allow them to continue to exist in that manner was inhumane. Dr. Heidel stated a history of the rabbits might have been beneficial in her diagnosis, explaining such would have been helpful in determining the best and most effective way of treating the entire herd. On re-direct, Dr. Heidel noted a rabbit's history would have been helpful in determining the cause of a particular rabbit's emaciation. For example, knowing the animal's feeding patterns could assist in a determination of whether its emaciated state was caused by wryneck. At the close of the State's case, appellant made an oral motion for acquittal pursuant to Crim.R. 29. The trial court denied the motion. Thereafter, appellant proceeded with the presentation of her case. Eleven witnesses, including appellant, appellant's husband, and appellant's son, testified on her behalf. Samuel Waltz, Deputy Director of the Ohio Department of Agriculture, testified regarding the dry pack manure system, a method in which an animal lives on a bed of manure. Waltz stated, when utilizing this system, it was safe to allow manure to build up. Waltz testified the dry pack system is an acceptable industry standard. Upon viewing pictures of the pole barn, Waltz noted the structure had proper cross ventilation and was typical of commercial rabbitries. On cross-examination, Waltz conceded his last inspection of a rabbitry was ten years ago. He also testified the cages used in a dry pack manure system should have solid floors. Daniel Widder, the branch manager of Tuscarawas Landmark Co-op, an agricultural retailer of feeds, fertilizers, and farm chemicals, testified appellant was a customer of the business. Widder detailed the amount of rabbit food purchased by appellant between January, 1998, and June, 1998. On January 6, 1998, appellant purchased 1000 pounds of rabbit feed, and another 1950 pounds on January 21, 1998. Appellant purchased a ton of rabbit feed on February 18, 1998, and an additional ton on March 20, 1998. On April 21, 1998, appellant purchased 1500 pounds of feed. On May 20, 1998, appellant purchased another 1500 pounds of feed. Widder, who is also an animal nutritionist, testified once a day feedings were normal, and a rabbit typically consumed between four and eight ounces depending on its breed. Because rabbits are nocturnal feeders, it would not be unusual to see empty feed dishes during the day. Widder explained rabbits do not feed without drinking; therefore, if feed remained in a bowl, one of two situations could be occurring. Either the animal was given too much food or not enough water. On cross-examination, Widder conceded although appellant purchased the rabbit feed, he could not verify the rabbits were actually fed. Rachelle Hobart testified appellant had been her 4-H advisor for ten years and she had purchased numerous rabbits from appellant. Hobart stated she visited appellant's barn in early April, 1998, in order to purchase a rabbit. Hobart went into the barn and looked at approximately ten pens of rabbits. She noted nothing unusual about the barn. Upon looking at the photographs of the barn taken on June 3, 1998, Hobart testified the barn was in the same condition it was in when she visited in April. She also stated the conditions of appellant's barn were similar to the conditions of other barns she had visited. On cross-examination, Hobart admitted she only viewed five or ten rabbits and twenty-five babies, and because she was specifically looking for a baby, she did not pay particular attention to the other rabbits.
Michael Carpenter, a rabbit dealer who has known appellant for four or five years, testified he deals with appellant on a weekly basis. Carpenter testified he has observed Neil, appellant's son, feed and water the rabbits. Upon viewing the photographs of the barn taken on June 3, 1998, Carpenter saw nothing unusual or unhealthy about the interior of the structure. He recalled he visited appellant's barn a week or two before the incident, purchasing rabbits, and would not buy an animal if it were unhealthy, explaining an unhealthy rabbit would contaminate his herd. On cross-examination, Carpenter conceded he did not know when the search warrant had been executed; therefore, he could not say for certain when he last visited the barn. Carpenter admitted he did not know if there was food for the rabbits on June 3, 1998, because he was not appellant's property every day. Barbara Butler, who has raised rabbits and guinea pigs as a hobby for the last thirty-three years and who is also a rabbit judge, testified regarding the feeding habits of rabbits. She noted she feeds her 111 rabbits once a day, in the evening. She explained it was not unusual for feeding bowls to be empty at the end of a twenty-four hour period. She also acknowledged it was not unusual to feel the ribs and backbone of rabbits of certain breeds. Butler maintained wryneck was not caused by a lack of food or water. On cross-examination, Butler testified she had never visited appellant's barn and her last contact with appellant was in the Fall, 1997. Debra Jo Fair, who has known appellant for five years, testified she became acquainted with appellant through 4-H at the Tuscarawas County Fair. Fair and her children take 4-H rabbits. Over the course of her acquaintance with appellant, Fair and her children have had approximately sixteen of appellant's rabbits. Fair and her children visited appellant's barn during the first week of June, 1998. Fair testified she did not notice anything unusual about the barn. She observed rabbits eating and moving about their cages. She also saw food and water in the rabbit cages. Fair did not observe any rabbits which appeared to be sick. On cross-examination, Fair admitted she was wrong in stating she observed water bottles in the cages on the day of her visit. Dr. Kathleen Bryant, a veterinarian, testified appellant contacted her shortly after the Humane Society seized the rabbits and requested Dr. Bryant view the rabbits at the Tuscarawas County Fairgrounds. Dr. Bryant stated she and appellant were unable to view the rabbits until July, 1998, due to her schedule. During the July visit, Dr. Bryant examined over 100 rabbits and observed a variety of problems, ranging from upper respiratory to thinness. Dr. Bryant noted a determination of the cause of rabbit's emaciation would be difficult to do simply conducting an examination without knowing its history. Diagnostic tests, including basic blood work, would assist in determining the cause of the emaciation. Dr. Bryant opined rabbits A-J could not be properly diagnosed without a history and diagnostic testing. On cross-examination, Dr. Bryant testified she has had contact with appellant on a professional basis between twenty to thirty times. She has visited appellant's property six or seven times. During those visits, Dr. Bryant stated she never entered the rabbit barn. Dr. Bryant conceded she has never treated a rabbit with wryneck. The veterinarian stated she has examined rabbits in the past without knowing their entire histories and was able to make proper diagnosis. Dr. Bryant also admitted it would not be inappropriate to transport nine rabbits in one cage. Although Dr. Bryant would not concede the conditions of the ten rabbits at issue were the result of neglect, she acknowledged the living environment would need to be changed. Neil Brown, appellant's son, testified his daily chores on the farm included feeding and watering the rabbits. He recalled feeding and watering the rabbits on June 3, 1998, and June 4, 1998. He stated he fed and watered the rabbits every night, seven days a week. On cross-examination, Neil stated it would take him an hour or more to feed and water the rabbits. In addition to this chore, Neil had other chores on the farm. Neil testified the amount of feces in some of the cages prevented him from opening the cage door, so he would bend the wires in order to feed the rabbits in those cages. Marvin Brown, appellant's husband, testified he and appellant have been married for twenty years. Appellant raised rabbits before the couple was married and brought the rabbits with her to the farm after their marriage. Mr. Brown recalled he was working in the dairy barn on the morning of June 3, 1998, when he heard the dogs barking. He stepped out of the barn and observed a vehicle in the driveway. Upon approaching the vehicle, he noticed Humphries and Durning. Humphries informed Mr. Brown about the complaint the Humane Society had received about the rabbits. Mr. Brown gave Humphries and Durning permission to view the inside of the barn. As he walked through the barn with the two women, Mr. Brown did not see anything unusual or any rabbits with wryneck. Mr. Brown admitted some of the rabbit pens, which he described as "temporary", were bad, but stated the others were basically clean. Mr. Brown explained appellant, who manages the operation of the rabbit barn, had jury duty in Federal Court the week prior to the Humane Society's visit. Due to the extended hours appellant was away from the home, the only thing done for the rabbits during that time was feeding and watering. Mr. Brown noted the barn had adequate ventilation. He conceded a smell existed, but explained the odor came from the carcass of a coyote, which was being left to rot in order for the Department of Natural Resources to study. He stated no ammonia smell existed in the building. Mr. Brown noted he observed approximately three dead rabbits in the barn during his walk through with Humphries and Durning. He denied the pile of dead rabbits Humphries described. He testified it was typical to have some animals die with the amount of rabbits in the barn. After Mr. Brown, Humphries, and Durning exited the barn, Humphries gave Mr. Brown a written warning. The warning provided appellant with four weeks to clean the barn. That evening and the following day, appellant and her children began to hang new pens in the barn. On cross-examination, Mr. Brown testified he did not spend "much" time in the barn during the winter and spring of 1998. During the June 3, 1998 visit, Mr. Brown told Humphries the conditions in the barn were the worst they had ever been. He explained, in the Fall, 1996, appellant had increased the number of rabbits in her herd. Sometime in 1998, the family had decided to cut back from 138 to 56 rabbits. As a result, many rabbits were housed in temporary pens. Mr. Brown explained the sheer number of pens prevented keeping them properly cleaned. Although he knew the conditions were bad, he maintained all the rabbits were healthy. On re-direct, Mr. Brown stated the last time he was in the barn, which was the last week of May, he did not observe any rabbits suffering. Appellant testified on her own behalf. She stated she had been in the rabbit business for thirty-four years and her business is registered through the American Rabbit Breeder's Association. Appellant testified Patty Pounds, the person who filed the complaint with the Humane Society, had not been in her barn for six or seven years. Appellant noted she is primarily responsible for the care of the rabbits, but her son, Neil, normally assists her. Appellant also explained she was on jury duty the week prior to the Humane Society visit and that commitment interfered with her responsibilities on the farm. She admitted, as a result, the barn was worse then what she wanted. Manure had built up in the barn, but she made sure the manure remained dry. Appellant testified she had expanded the rabbit operation approximately 1 1/2 years prior to the incident at issue. Recently, appellant and her husband decided to cut back the number of rabbits in the herd. Appellant purchased new cages and planned to replace everything in the barn. The extended operation was a partial cause of the condition of the barn. The temporary pens made it difficult to care for the rabbits in an efficient amount of time. The family made the decision to focus their time on other aspects of the farm operation and lower the size of the herd. Appellant maintained she did not neglect her animals, rationalizing, if she did, she would be unable to sell them. As part of the normal course of her rabbit operation, appellant frequently handled individual rabbits. She conducted a visual inspection of each rabbit every night to insure they were healthy and they were eating. During the two or three week prior to June 3, 1998, appellant noticed a couple of the rabbits were not eating. Ultimately, those rabbits died. Because she did not have time to bury them, she placed the bodies outside of the pens in order to use the pens for other rabbits. She also observed one of the rabbits had started to develop wryneck. She placed that rabbit and one disabled buck into what she classified as the "geriatric pen." Appellant stated she did not observe any rabbits with the conditions described by Dr. Heidel. On cross-examination, appellant admitted she told one of the Humane Society officers and the dog warden the conditions in the barn were pathetic. She explained, although she knew the animals were taken care of, the Humane Society people would not understand. Appellant would not concede the conditions in the barn could result in detrimental health problems for the rabbits. Appellant asserted she did not have four rabbits in herd with wryneck, explaining if she had more than two rabbits at any one time with wryneck, she would have contacted rabbit specialists at Nebraska University or the Ohio State University. Appellant agreed, regardless of whether the rabbit is for production or a pet, all rabbits need food, water, and dry shelter. On re-direct, appellant maintained the conditions in her rabbit barn on June 3, 4, and 5, 1998, did not result in any of the animals being deprived of food, water, or dry shelter. Appellant again admitted the barn was dirtier than she preferred, but she had taken steps to correct the problem. At the close of her case, appellant renewed her Crim.R. 29 Motion for Acquittal. The trial court again denied the motion. After hearing all the evidence and deliberations, the jury found appellant guilty of ten counts of cruelty to animals. On May 14, 1999, appellant filed a written Motion for Judgment of Acquittal, and Motion for New Trial. After the State filed its memoranda in opposition to both motions, the trial court overruled appellant's motions via Judgment Entry filed August 11, 1999. Thereafter, on August 23, 1999, the trial court conducted a sentencing hearing. The trial court merged the ten counts into one count. The trial court ordered appellant to pay a fine of $100, plus court costs. In addition, the trial court sentenced appellant to thirty days in jail, but suspended the entire sentence and placed appellant on one year probation. The trial court memorialized the convictions and sentence in a Judgment Entry filed August 31, 1999. It is from these convictions and sentence appellant prosecutes this appeal, raising the following assignments of error:
 I. THE TRIAL COURT ERRED IN FAILING TO GRANT THE DEFENDANT-APPELLANT'S MOTION TO SUPPRESS THE EVIDENCE IN THIS CASE.
 II. THE TRIAL COURT ERRED IN FAILING TO GRANT THE DEFENDANT-APPELLANT'S MOTION FOR A NEW TRIAL.
 III. THE TRIAL COURT ERRED IN FAILING TO GRANT THE DEFENDANT-APPELLANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL REQUESTED DURING AND AFTER THE PROCEEDINGS.
 IV. THE FINDING OF GUILT BY THE JURY AND THE JUDGMENT ENTERED THEREON IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 I
In her first assignment of error, appellant maintains the trial court erred in failing to grant her motion to suppress. There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. See: State v. Fanning (1982), 1 Ohio St.3d 19; State v. Klein (1991), 73 Ohio App.3d 486; State v. Guysinger (1993), 86 Ohio App.3d 592. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. See: State v. Williams (1993),86 Ohio App.3d 37. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. State v. Curry (1994), 95 Ohio App.3d 93, 96; State v. Claytor (1993), 85 Ohio App.3d 623,627, 620 N.E.2d 906, 908; and State v. Guysinger (1993), 86 Ohio App.3d 592. As the United States Supreme Court held in Ornelas v. U.S. (1996), 116 S.Ct. 1657, ". . . as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." In her motion to suppress, appellant challenged the validity of the search warrant, attacking the sufficiency on its face of the search warrant affidavit, and alleging wrongdoing on the part of the affiant, Lesli Humphries, in making false statements in the affidavit. "To successfully attack the veracity of a facially sufficient search warrant affidavit, a defendant must show by a preponderance of the evidence that the affiant made a false statement, either `intentionally, or with reckless disregard to the truth'." State v. Waddy (1992), 63 Ohio St.3d 424, 441, citing Frank v. Delaware (1978), 438 U.S. 154, 155-156, 98 S.Ct. 2674, 2676,57 L.Ed.2d 667, 672. "`Reckless disregard' means that the affiant had serious doubts of an allegation's truth." Id. (Citation omitted). "Omissions count as false statements if `designed to mislead, or * * * made in reckless disregard of whether they would mislead, the magistrate'." Id. (Emphasis deleted in original) (Citation omitted). The trial court found the affidavit did contain false allegations and the false allegations were made in reckless disregard of whether or not such statements would mislead the trial court judge issuing the search warrant. The trial court excised these allegations from the affidavit and examined the sufficiency of the affidavit without such statements. "Even if the affidavit contains false statements made intentionally or recklessly, a warrant based on the affidavit is still valid unless, `with the affidavit's false materials set to one side, the affidavit's remaining content is insufficient to establish probable cause * * * `." Id. (Citation omitted). The trial court concluded the affidavit's remaining content were sufficient to establish probable cause for the issuance of the search warrant. The following allegations remained after the false material had been excised: 2. On June 3, 1998, my Humane Officer Assistant and myself made a trip to Mrs. Brown's residence. Upon arrival, Debbie Brown was not at home. We knocked on the door of her residence but got no answer. * * * We then walked to the pole barn, but did not enter it. Just looking through the doors, . . . we could see that the conditions were very bad.
3. Within several minutes a man, whom identified himself as Marvin Brown, Debbie Brown's husband approached us. He had been working in a cow barn on the adjoining property. We identified ourselves and asked him permission to enter the pole barn. We all entered the pole barn.
4. The smell in the pole barn was very overcoming. It smelled of death, urine and feces. The barn houses approximately 75 to 100 rabbits. The floor of the barn is covered with rabbit urine and covered with feces. In some locations there is rabbit feces six to twelve inches deep . . . Most of the rabbit cages had feces six to twelve inches deep in them and the rabbits were living on top of the feces. Most of the rabbits appeared to be sick . . . We saw no food or water for any of the rabbits . . .
5. Also being housed in the pole barn were approximately 8 to 10 dogs. The one dog pen had approximately two feet of mud mixed with feces in it. They also had no food or water. We then asked permission and took pictures of the conditions in the barn.
6. We walked out and found two dogs living in a divided horse trailer, which was parked in the sun, with no shade. The [sic] also had no food or water and were living in their own feces.
7. In the area beside their house, they had dogs tied to dog boxes, they also had no food, water or shade. There were approximately six dogs.
* * *
10. I have contacted the Tuscarawas County Sheriff's Department, the Tuscarawas County Health Department and the Tuscarawas County 4-H Board. I have learned that Debbie Brown is a 4-H Advisor.
Affidavit of Lesli J. Humphries. Appellant maintains the information provided to Judge Lile was totally misleading due to the false statements contained in the affidavit; therefore, the trial court erred in finding the remaining affidavit to be sufficient. Appellant asserts Humphries had to "sneak around" the property in order to make the observations upon which she based the allegations in her affidavit. Despite the fact Mr. Brown later gave Humphries permission to enter the barn and take photographs, the information obtained while she was in the barn should have been suppressed. Appellant submits if Humphries had not trespassed or placed herself in a position to make the observations, she would not have had reason to ask Mr. Brown to allow her to search the barn. We do not find Humphries was a trespasser on appellant's property on June 3, 1998. Upon arriving at the property, Humphries went to the front door of the residence and knocked, but no one responded. As Humphries began to walk away from the house toward her vehicle, she noticed the doors of the pole barn were open. There were no "No Trespassing" signs. We do not find appellant's Fourth Amendment right to a reasonable expectation of privacy was violated by Humphries' behavior. Humphries made her initial observations from an open door of the barn, which was located next to the driveway. Additionally, Mr. Brown gave Humphries consent to enter the barn and photograph the rabbits. We find the information obtained while Humphries was outside the barn, and after she was subsequently allowed to view the interior of the barn, was properly used in her affidavit. Furthermore, we find the allegations remaining in the affidavit after the false material was set aside provided sufficient probable cause for the issuance of the search warrant. Accordingly, we find the trial court did not err in overruling appellant's motion to suppress. Appellant's first assignment of error is overruled.
 II, III, IV
Because our disposition of appellant's remaining assignments of error necessarily involve an analysis of the sufficiency and weight of the evidence, we shall address said assignments of error together. In her second assignment of error, appellant maintains the trial court erred in failing to grant her motion for a new trial. In her third assignment of error, appellant submits the trial court erred in failing to grant her Crim.R. 29 Motion for Acquittal. In her final assignment of error, appellant contends the jury's verdicts were against the manifest weight of the evidence. In State v. Jenks (1981), 61 Ohio St.3d 259, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jenks, supra, at paragraph two of the syllabus. When applying the aforementioned standard of review to the case sub judice, based upon the facts noted supra, we do not find, as a matter of law, appellant's convictions were based upon insufficient evidence. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. State v. Thompkins (1997), 78 Ohio St.3d 380, 387 citing State v. Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus 1. With respect to all three assignments of error, appellant asserts the State failed to present any evidence she tortured rabbits A-J on June 3, 1998, the date of the alleged offenses. Appellant asserts although Dr. Heidel testified regarding the conditions of and injuries to the rabbits which she observed on June 5, 1998, and such could have been caused by neglect, the veterinarian was unable to testify regarding the conditions of the animals on June 3, 1998. Appellant maintains the evidence presented on her behalf was equally compelling and established the conditions of and injuries to the rabbits were caused by other factors. At trial, Dr. Heidel testified regarding the conditions of and injuries to rabbits A-J. Dr. Heidel opined the rabbits were in these conditions as a result of neglect. Humphries, Durning, Slough, and Sgt. McEnroe testified to varying degrees regarding the state of the pole barn in which the rabbits were located. The State's witnesses, who had entered the barn, all described an overwhelming odor of urine and feces. Humphries testified she did not observe any food or water in the rabbit cages on June 3, 1998. Additionally, she noted the floor of the barn as well as the cages were completely piled with rabbit feces. Durning testified similarly. Based upon the facts noted supra, and the entire record, we do not find the jury's verdicts were against the manifest weight of the evidence. The jury was free to accept or reject any or all of the testimony of the witnesses and assess the credibility of those witnesses. We do not find the jury clearly lost its way in the resolution of the testimony. Although the jury was presented with evidence to demonstrate the manner in which the rabbits were kept was not unusual and was acceptable within the industry, we find there was competent, credible evidence for a finding to the contrary. Accordingly, we do not find the trial court erred in denying appellant's motion for a new trial and Crim.R. 29 motion for acquittal. Appellant's second, third, and fourth assignments of error are overruled.
The convictions and sentence of the New Philadelphia Municipal Court are affirmed.
 __________________ Hoffman, P.J.
By: Hoffman, P.J. Farmer, J. and Edwards, J. concur.